UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

STEVEN W. HOLLAND,

      Plaintiff,

-vs-                         Case No.:  1:15-cv-00306-HSO-JCG

KEESLER FEDERAL CREDIT UNION,

      Defendant.

_____/

## PLAINTIFF'S MEMORANDUM IN SUPPORT
## OF MOTION TO COMPEL AND FOR SANCTIONS

      Plaintiff, STEVEN W. HOLLAND, hereby moves this Honorable Court for an Order compelling the Defendant, KEESLER FEDERAL CREDIT UNION ("Keesler"), to produce the materials identified herein, and imposing sanctions on Defendant and Defendant's counsel for the reasons set forth herein, and in support thereof, states as follows:

      1.      Plaintiff's Complaint in this action asserts, among other thing, a claim against Keesler for violation of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(b)(1)(A)(iii) arising out of Keesler having allegedly initiated in excess of two-hundred (200) calls to Plaintiff's cellular telephone number using an automated telephone dialing system and/or prerecorded voice message without Plaintiff's prior express consent, or after Plaintiff revoked any such consent.

      2.      On March 9, 2016, the Plaintiff served upon the Defendant his First Set of Interrogatories, First Requests for Production and First Requests for Admission (collectively "Plaintiff's First Set of Discovery Requests").[1]

---

[1] A copy of Plaintiff's First Set of Discovery Requests is included herewith as Composite Exhibit "A."

3.      On April 6, 2016, the Plaintiff served upon the Defendant his Second Set of Interrogatories and Second Request for Production (collectively "Plaintiff's Second Set of Discovery Requests").[2]

4.      On April 15, 2016, the Defendant served upon Plaintiff its Responses to Plaintiff's First Set of Interrogatories, Responses to Plaintiffs' First Requests for Admissions, and Answers to Plaintiff's First Set of Interrogatories (collectively "Defendant's Responses to Plaintiff's Second Set of Discovery Requests").[3]

5.      On May 5, 2016, the Defendant served upon the Plaintiff its Responses to Plaintiff's Second Request for Production and Answers to Plaintiff's Second Set of Interrogatories (collectively "Defendant's Responses to Plaintiff's Second Set of Discovery Requests").[4]

6.      On July 10, 2016, Plaintiff's undersigned counsel sent a letter to counsel for Defendant, Robert Schwartz, Esq., identifying certain deficiencies with Defendant's discovery responses. Notably, the letter stated that Defendant had failed to produce documents reflecting the date and time of each call it placed to Plaintiff's cellular telephone number, and documents reflecting any notes made by Defendant's representatives contemporaneous with making such calls, and that Defendant's objections to the Plaintiff's requests for these materials were legally deficient.[5]

7.      After receiving the letter, Defendant and Defendant's counsel refused to correct any of the discovery deficiencies identified in the letter, including refusing to withdraw any of the

---

[2] A copy of Plaintiff's Second Set of Discovery Requests is included herewith as Composite Exhibit "B."

[3] A copy of Defendant's Responses to Plaintiff's First Set of Discovery Requests is included herewith as Composite Exhibit "C."

[4] A copy of Defendant's Responses to Plaintiff's Second Set of Discovery Requests is included herewith as Composite Exhibit "D."

[5] A copy of the July 10, 2016 letter is included herewith as Exhibit "E."

numerous improvident objections and refusing to produce the supplemental materials requested therein – notably, Keesler's call log reflecting calls it made to Plaintiff's cellular telephone number during the requested time period, Keesler's account notes corresponding to any conversations it had with the Plaintiff's during the same time period, and any audio recordings of the Plaintiff.[6]

8.     On July 14, 2016, Plaintiff filed his Motion for Extension of certain deadlines and events in this action, including the Discovery Deadline and the Dispositive and *Daubert* Motions Deadline (Dkt. 39), which was necessitated by the significant difficulties Plaintiff's counsel has encountered during the discovery process in an effort to obtain essential information and materials that are within the Defendant's sole possession and control. Notably, Plaintiff's Motion for Extension (Dkt. 39) outlines in thorough detail, with supporting exhibits, Plaintiff's numerous unsuccessful efforts to coordinate the deposition of Defendant's Rule 30(b)(6) witness prior to the discovery deadline due to the lack of cooperation by Defendant's counsel. Plaintiff's Motion for Extension also explained that "Defendant's discovery deficiencies have precluded the Plaintiff's telecommunications expert, Randall A. Snyder, from rendering complete opinions regarding the functionality of Defendant's dialing system with respect to the telephone calls at issue in this action, which is material to the Plaintiff's ability to prove the elements of his claim under the [TCPA]."[7]

9.     A telephonic hearing was held on Plaintiff's Motion for Extension (Dkt. 39) before Magistrate Judge John C. Gargiulo on August 19, 2016 at 10:00 a.m. During that hearing, counsel for Defendant argued that the Court should deny Plaintiff's request for additional time to conduct the deposition of Defendant's 30(b)(6) witness and should not permit Plaintiff any additional time

---

[6] See Ex. E, at p. 8.

[7] See Dkt. 39, p. 4, ¶ 20.

for his expert to render opinions concerning the telecommunications systems used by Defendant to make calls to Plaintiff's cellular telephone number.

10.     Following the August 19, 2016 hearing, the Court entered an Amended Case Management Order which scheduled the Plaintiff's deposition for August 29, 2016, and the deposition of Defendant's 30(b)(6) witness for August 30, 2016. The Amended Case Management Order further provided an extended deadline of September 9, 2016 for Plaintiff to supplement his expert report, extended the Discovery Deadline to September 26, 2016, and extended the Dispositive and *Daubert* Motions Deadline to October 10, 2016.

11.     Pursuant to the dates scheduled by Magistrate Judge Gargiulo during the August 19, 2016 hearing and this Court's Amended Case Management Order, Plaintiff was deposed on August 29, 2016, and Defendant's 30(b)(6) witness was deposed on August 30, 2016.

12.     As more thoroughly explained below, although the deposition of Defendant's 30(b)(6) witness provided the Plaintiff with significant information that addressed many of the discovery issues addressed in the July 10, 2016 letter, the deposition also clarified and confirmed that certain information and materials that are essential to Plaintiff's TCPA claim in this action, which Defendant refused to produce in either narrative or document form in response to Plaintiff's written discovery requests and subsequent July 10, 2016 good-faith letter, are indeed within Defendant's sole possession and control, are stored on Defendant's computer system in a program called "Akcelerant,"[8] have been reviewed by Defendant and/or its counsel during this litigation,[9] are capable of being easily produced, are capable of being redacted to remove any potential private or confidential information, and are required to be produced in the form of document/electronic

---

[8] See Ex. "F," Depo. D. Powell, p. 78:8 to 78:23; 108:25 to 109:22

[9] Id., at 109:4 to 110:24.

materials, as Defendant's designated 30(b)(6) witness was incapable of providing the requisite details during the 30(b)(6) deposition and deferred to such materials as the only source capable of providing these essential details.

## I.    Introduction

At the outset, Plaintiff would submit that he brings this Motion reluctantly; doing so only after making every conceivable good faith effort to obtain the information and materials at issue herein without further burdening this Court's heavy schedule to intervene in a discovery dispute. Unfortunately, the discovery issues addressed herein, and which trace back to and encompass the more numerous issues raised in Plaintiff's July 10, 2016 letter to Defendant's counsel, epitomize the "winning through obstruction" approach to discovery that is rampant in the current landscape of federal court civil litigation. Federal courts throughout the country have universally condemned this practice. As the Honorable Mark W. Bennett eruditely observed in lamenting the state of modern discovery practice,

> Something is rotten, but contrary to Marcellus's suggestion to Horatio, it's not in Denmark.[10] Rather, it's in discovery in modern federal civil litigation right here in the United States. …
>
> Discovery—a process intended to facilitate the free flow of information between parties—is now too often mired in obstructionism. Today's "litigators" are quick to dispute discovery requests, slow to produce information, and all-too-eager to object at every stage of the process. They often object using boilerplate language containing every objection imaginable, despite the fact that courts have resoundingly disapproved of such boilerplate objections.[11] Some litigators do this to grandstand for their client, to intentionally obstruct the flow of clearly discoverable information, to try and win a war of attrition, or to intimidate and harass the opposing party. Others do it simply because it's how they were taught. As my distinguished colleague and renowned expert on civil procedure Judge Paul

---

[10] (citing "William Shakespeare, Hamlet, act 1, sc. 4.").

[11] (citing Matthew L. Jarvey, Note, *Boilerplate Discovery Objections: How They Are Used, Why They Are Wrong, and What We Can Do About Them,* 61 DRAKE L.REV. 913, 917 n. 20 (2013) (collecting cases disapproving of boilerplate objections); *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.,* 198 F.R.D. 508, 513 (N.D.Iowa 2000) (same)).

Grimm of the District of Maryland has written: "It would appear that there is something in the DNA of the American civil justice system that resists cooperation during discovery."[12] Whatever the reason, obstructionist discovery conduct is born of a warped view of zealous advocacy, often formed by insecurities and fear of the truth. This conduct fuels the astronomically costly litigation industry at the expense of "the just, speedy, and inexpensive determination of every action and proceeding." Fed.R.Civ.P. 1. It persists because most litigators and a few real trial lawyers—even very good ones, like the lawyers in this case—have come to accept it as part of the routine chicanery of federal discovery practice.[13]

But the litigators and trial lawyers do not deserve all the blame for obstructionist discovery conduct because judges so often ignore this conduct,[14] and by doing so we reinforce—even *incentivize*—obstructionist tactics.[15] Most litigators, while often inept in jury trials (only because they so seldom experience them), are both smart and savvy and will continue to do what has worked for them in the past. Obstructionist litigators, like Ivan Pavlov's dogs, salivate when they see discovery requests and are conditioned to unleash their treasure chest of obstructive weaponry. Unlike Pavlov's dogs, their rewards are not food but successfully blocking or impeding the flow of discoverable information. Unless judges impose serious adverse consequences, like court-imposed sanctions, litigators' conditional reflexes will persist. The point of court-imposed sanctions is to stop reinforcing winning through obstruction.

---

[12] (citing Hon. Paul W. Grimm & David S. Yellin, *A Pragmatic Approach to Discovery Reform: How Small Changes Can Make a Big Difference in Civil Discovery,* 64 S.C. L.REV. 495, 530 (2013)).

[13] "Judge Grimm and David Yellin aptly describe some of the misplaced motivations behind obstructionist tactics:

> The truth is that lawyers and clients avoid cooperating with their adversary during discovery—despite the fact that it is in their clear interest to do so—for a variety of inadequate and unconvincing reasons. They do not cooperate because they want to make the discovery process as expensive and punitive as possible for their adversary, in order to force a settlement to end the costs rather than having the case decided on the merits. They do not cooperate because they wrongly assume that cooperation requires them to compromise the legitimate legal positions that they have a good faith basis to hold. Lawyers do not cooperate because they have a misguided sense that they have an ethical duty to be oppositional during the discovery process—to "protect" their client's interests—often even at the substantial economic expense of the client. Clients do not cooperate during discovery because they want to retaliate against their adversary, or "get back" at them for the events that led to the litigation. But the least persuasive of the reasons for not cooperating during the discovery process is the entirely misplaced notion that the 'adversary system' somehow prohibits it.

Grimm & Yellin, *supra* note 4, at 525–26 (footnotes omitted). Amen Brother Grimm and Mr. Yellin for being so insightful and refreshingly candid." Id. at n.5.

[14] (citing Daniel C. Girard & Todd I. Espinosa, *Limiting Evasive Discovery: A Proposal for Three Cost–Saving Amendments to the Federal Rules,* 87 DENV. U.L.REV.. 473, 475 (2010) ("The Federal Rules prohibit evasive responses.... In practice, however, these rules are not enforced. Service of evasive discovery responses has become a routine—and rewarding—litigation tactic.").

[15] (citing id. at 483 ("The reluctance of courts to impose sanctions under Rule 37 has encouraged the use of evasive and dilatory behavior in response to discovery requests. Such behavior serves no purpose other than to increase the cost and delays of litigation.").

<u>Sec. Nat. Bank of Sioux City, Iowa v. Abbott Labs.</u>, 299 F.R.D. 595, 596-97 (N.D. Iowa 2014).[16]

The Eleventh Circuit has made similar observations concerning this rampant discovery abuse by attorneys placing victory and the interests of their clients over their duties as officers of the court, servants of the law, and to maintain the integrity of the legal system:

> The discovery rules in particular were intended to promote the search for truth that is the heart of our judicial system. However, the success with which the rules are applied toward this search for truth greatly depends on the professionalism and integrity of the attorneys involved. Therefore, it is appalling that attorneys, like defense counsel in this case, routinely twist the discovery rules into some of "the most powerful weapons in the arsenal of those who abuse the adversary system for the sole benefit of their clients."
>
> All attorneys, as "officers of the court," owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. …
>
> Unfortunately, the American Bar Association's current Model Rules of Professional Conduct underscore the duty to advocate zealously while neglecting the corresponding duty to advocate within the bounds of the law. As a result, too many attorneys have forgotten the exhortations of these century-old canons. Too many attorneys, like defense counsel in this case, have allowed the objectives of the client to override their ancient duties as officers of the court. In short, they have sold out to the client.
>
> We must return to the original principle that, as officers of the court, attorneys are servants of the law rather than servants of the highest bidder. We must rediscover the old values of our profession. The integrity of our justice system depends on it.

<u>Malautea v. Suzuki Motor Co., Ltd.</u>, 987 F.2d 1536, 1546-47 (11th Cir. 1993).

As shown below, the very type of obstructionist discovery conduct that federal courts have repeatedly condemned continues to persist, and has plagued the discovery process in this case. The

---

[16] <u>rev'd sub nom.</u>, <u>Sec. Nat. Bank of Sioux City, IA v. Day</u>, 800 F.3d 936 (8th Cir. 2015). The Eighth Circuit, in reversing Judge Bennet's Order imposing sanctions, did not disagree with Judge Bennet's aforementioned admonishments or conclusions, but merely reversed the order to the extent of the particular sanction imposed based on the lack of the required advance particularized notice of the unusual nature of the sua sponte sanction being considered, requiring defendant's counsel to produce a discovery training video to be distributed to attorneys at her firm, which was imposed on the court's own motion upon reviewing deposition transcripts submitted with a party's summary judgment motion, involving deposition conduct that had occurred two-years prior.

conduct of Defendant and its counsel during the discovery phase of this action, including the refusal to cooperate with Plaintiff's counsel to coordinate the deposition of Defendant's 30(b)(6) witness, which necessitated the Plaintiff filing his Motion for Extension of deadlines and seeking the assistance of this Court to schedule the deposition of Defendant's 30(b)(6) witness, the Defendant's ongoing refusal to produce the materials that are the subject of this motion and essential to the Plaintiff's case, the Defendant's false, misleading and/or incomplete discovery responses, boilerplate and frivolous objections, and the continued refusal of Defendant's attorneys to cooperate concerning the requested materials during the recent depositions, epitomize the obstructionist discovery conduct that has been repeatedly condemned by federal courts, and which should not be tolerated by this Court.

To be clear, Plaintiff is not requesting that this Court further extend the discovery period or otherwise delay the schedule established by this Court's recent Amended Case Management Order – Plaintiff is merely requesting that this Court order the Defendant to produce the materials that it has wrongfully withheld, which are essential to Plaintiff's case, and which Defendant's 30(b)(6) witness recently confirmed to be within Defendant's exclusive possession and the sole source of the evidence concerning the elements of Plaintiff's TCPA claim, as described herein. Accordingly, for the reasons more fully set forth below, Plaintiff respectfully requests that the Court compel Defendant to produce the requested materials, and impose sanctions on the Defendant and its counsel for its flagrant abuse of the discovery process, including payment of Plaintiff's attorneys' fees incurred in bringing this motion, and such other sanctions as this Court deems appropriate.

II.   **Keesler's Refusal to Produce the Requested Call Logs/Collection Notes and Recordings**

   1.   Plaintiff's Request for Production of Call Logs and Account Notes:

Request No. 3 of Plaintiff's First Request for Production seeks production of the following materials from Keesler:

> *Documents evidencing and/ or reflecting each time Defendant spoke to the Plaintiff*

Request No. 5 of Plaintiff's First Request for Production seeks the following materials from Keesler:

> *Documents evidencing and/or reflecting any notes taken or entered into a computer by Defendant contemporaneously with all phone calls made by the Defendant to the Plaintiff's cellular telephone number, (228) 343-1833, or from the Plaintiff to the Defendant, during the "relevant time period."*

Request No. 6 of Plaintiff's First Request for Production seeks production of the following materials:

> *Documents evidencing and/or reflecting the date, time and length of all telephone calls made by or on behalf of the Defendant to Plaintiff's cellular telephone number, (228) 343-1833, during the relevant time period.*

Keesler's Response to Requests 3, 5 and 6 consists of an identical multi-part objection, pursuant to which Keesler has refused to produce any responsive documents.[17]

   A.   *Objection Part One*

The first objection asserted by Keesler in its Response to Requests 5 and 6 states:

> *[Keesler] objects to the extent the Request implies that KFCU is required to keep records of each and every time an employee of the Defendant spoke to the Plaintiff, even if unrelated to the claims in this case, which is unlimited in scope and time, and is further unlimited by the definitions employed by the Plaintiff.*

---

[17] Because of the length and multiple parts of the objection asserted therein, each part of the objection is separately addressed herein.

Plaintiff would submit that the above objection is both legally improper and factually inaccurate. To begin with, the Request makes no reference whatsoever to any *requirement* on the part of Keesler, and there is no definition in the Definitions section of the Requests that would modify or otherwise alter the meaning or scope of the Request to imply any such requirement. Rather, it plainly and succinctly requests that Keesler produce any documents in its possession or control that are responsive to the Request. Keesler's objection was also misleading, in that it suggests doubt as to whether Keesler has a policy of making notes contemporaneously with telephone communications. However, during the August 30, 2016 deposition of Keesler's 30(b)(6) witness, Delma Powell, Mr. Powell testified that Keesler's corporate policy is, in fact, for its representatives to make a contemporaneous record each and every time Keesler initiates an outbound collection call, regardless of whether the call is answered or reaches the intended recipient of the call.[18] Therefore, the objection was unnecessarily misleading as to the nature of the materials in Keesler's possession that are being withheld.

Additionally, Keesler's contention that the Request "is unlimited in scope and time" ignores the plain language of the Request, specifically limiting the temporal scope to the "relevant time period," which is defined in the "Definitions" section of Plaintiff's Requests for Production as follows:

> 20. *"Relevant time period" or "relevant period" means the period beginning September 1, 2013, (or the date of Plaintiff's first contact with Defendant, or vice versa) to the present date.*

As such, the first of Keesler's objections to Requests 3, 5 and 6, as quoted above, is both factually inaccurate, legally improper, and in violation of Rule 26(g), as discussed *infra*.

---

[18] See Ex. "F," Depo. D. Powell, p. 111:8 to 112:20.

B.   *Objection Part Two*

The second part of Keesler's Response and objection to Requests 3, 5 and 6 states

*Without waiving the [previous objection], and in a good faith attempt to respond, KFCU maintains collection call logs relating to the loan made to Claude Holland and Bobbie Holland. KFCU objects to currently producing documents relating to the loan of Bobbie Holland and Claude Holland as the same are or may be protected by the Fair Credit Reporting Act of 1970 ("FCRA"), Gramm-LeachBliley Act ("GLBA)", and Right to Financial Privacy Act ("RFPA"), among other various federal laws. In order to produce any such documents, Defendant must be provided with an executed waiver and authorization to release the same from the duly authorized representative of Bobbie Holland and Claude Holland.*

As the Defendant is aware, Plaintiff's parents, Bobbie Holland and Claude Holland, are deceased. Bobbie Holland died on September 2, 2013, and Claude Holland died prior to her death. Plaintiff is a surviving son and next of kin to Bobbie Holland and Claude Holland. As counsel for the Defendant was advised, no probate proceedings were filed to administer the estates of Claude Holland or Bobbie Holland, and therefore, there is no formally appointed estate administrator or executor. Thus, there is no court appointed "duly authorized representative of Bobbie Holland and Claude Holland." Plaintiff, as the surviving son and next of kin to Bobbie Holland and Claude Holland, is the legal heir to his parents, and the Plaintiff requested the information that is the subject of Keesler's objection through formal written discovery in this action pursuant to the Federal Rules of Civil Procedure and this Court's Case Management Order. Keesler's cannot be permitted to refuse to provide the requested information by asserting that it "may be protected" by ambiguous references to statutes and unspecific laws, and requiring authorizations that cannot feasibly be obtained.

More importantly, the Requests do not seek production of any information that would be protected by the FCRA, GLBA, RFPA or any other privacy law. The Requests plainly seek

production of (1) notes taken by Keesler's representatives upon speaking with the Plaintiff telephonically during the "relevant time period" and (2) a log of all calls made by the Defendant to Plaintiff's cellular telephone number during the "relevant time period." They do not request financial or other personal information pertaining to the account of Claude and Bobbie Holland, notes reflecting communications with any party other than the Plaintiff, or records reflecting calls made to any telephone number other than the Plaintiff's, and Keesler is easily able to redact any such information to the extent it appears on documents responsive to these Requests.

Importantly, during the recent deposition of Plaintiff, in the spirit of cooperation, Mr. Holland was made available to sign an authorization as the legal heir and next of kin of Bobbie and Claude Holland, in an effort to satisfy Keeler's above stated condition.[19] Incredibly, as the transcript reflects, Keesler's attorneys have refused to accept Plaintiff's authorization, contending that Plaintiff would have been required to initiate a probate proceeding and be appointed as the executor or administrator of the estate of Claude and Bobbie Holland in order to satisfy its condition. Keesler's attorneys also refused the undersigned's suggestion to redact any alleged "privacy" information, leaving no other option than to seek the Court's intervention to resolve this dispute. As the undersigned explained to Keesler's attorneys during this discussion, the undersigned has litigated numerous TCPA cases in which the plaintiff was the erroneous recipient of "wrong number" autodialed or prerecorded calls made by creditors intending to reach their non-party borrowers. In every such case, the calls logs and account notes have routinely been redacted to remove any potentially private information about the borrower.[20]

---

[19] See Ex. G, excerpt of Depo. S. Holland, p. 138:17 to 140:22.

[20] See, e.g., Ex. "H" hereto, which represents "account notes" produced by a mortgage servicer in a TCPA case litigated by the undersigned in the U.S. District Court for the Southern District of Florida, in a case styled Perry v. Ocwen Loan Servicing, LLC, Case No.: 9:15-cv-81641-RLR (Dkt. 64-6, submitted in support of Plaintiff's Motion for Summary Judgment), involving hundreds of calls erroneously made to the plaintiff's cellular telephone number that were intended for the defendant's borrower, a third party unknown to the plaintiff. The account notes were

The fact that Plaintiff happens to be the son of Keesler's borrowers, and therefore potentially *could* have undertaken to initiate a probate proceeding and be formally appointed as the administrator of the borrowers' estates, involving significant time and expense, does not make the scenario present here different in any material way from other lawsuits involving allegedly unlawful contact by a creditor to a non-borrower. If every plaintiff that filed an action against a creditor or debt collector involving illegal contact concerning a third-party's account was required to track down and obtain an authorization from the third-party in order for records reflecting the defendant's contact *solely* with the plaintiff were able to be produced, it would effectively be impossible to pursue such claims. The federal discovery rules contemplate placing no such burden on plaintiffs, and Keesler's refusal to produce these records that are essential to Plaintiff's case is motivated by nothing more than to delay and obstruct.

C. *Objection Part Three*

Lastly, Keesler's Responses to Requests 3, 5 and 6 assert the following objection, which appears throughout Keesler's responses to Plaintiff's written discovery requests in various forms:

> *Plaintiff, Steven W. Holland, has a separate loan with the Defendant which is unrelated to the claims in this action, and additional communications between Plaintiff and Defendant occurred regarding said loan, which are not at issue in this case and for which production is not being made.*

This objection is premised upon a fatal misunderstanding of Plaintiff's TCPA claim in this action. The TCPA provision at issue in this case, 47 U.S.C. § 227(b)(1)(A)(iii), "makes it unlawful to make any call using an automatic telephone dialing system (an 'autodial system' [or 'ATDS'])

---

produced in response to requests for production worded nearly identically to the requests at issue herein. The account notes were redacted to remove any personal information regarding the defendant's borrower that would potentially be subject to privacy laws. As can be seen, the remaining information is in no way private or confidential, and pertains solely to the defendant's communications with the plaintiff therein. This is illustrative of the approach taken by every defendant to date in cases litigated by the undersigned in scenarios requiring the removal of private information about non-party borrowers. The same could easily be done by Keesler. It's refusal to do so is merely a tactic to delay and obstruct.

[or 'prerecorded or artificial voice'] to a cellular telephone without the prior express consent of the 'called party.'" Breslow v. Wells Fargo Bank, N.A., 755 F.3d 1265, 1266 (11th Cir.2014) (citing § 227(b)(1)(A)(iii)). Unlike the Fair Debt Collection Practices Act ("FDCPA"), FCRA and certain other consumer protection statutes, a TCPA action is not tied to a specific account or debt; rather, statutory standing to pursue a private right of action under the TCPA is conferred upon the "called party," and the private right of action under the TCPA provides for recovery of statutory damages for *all* calls made by a defendant using an ATDS or prerecorded message to the called party's cellular telephone without his prior express consent, regardless of the purpose(s) for the calls (with the exception of calls made for an "emergency purpose," as addressed *infra*). Accordingly, as the TCPA-specific allegations in Plaintiff's Complaint (Dkt. 1) reflect, Plaintiff's TCPA claim against Keesler encompasses *all calls* alleged to have been made by Keesler to Plaintiff's cellular telephone number without his prior express consent (or after that consent was revoked).[21]

Calls made by Keesler to Plaintiff's cellular telephone regarding his separate loan are not "unrelated to this action," as Keesler insists, and Keesler's potential liability under the TCPA is not limited to calls made regarding the account of Claude and Bobbie Holland. Essentially, Keesler is either seeking to force Plaintiff file a separate lawsuit to assert a TCPA claim that is already asserted in this lawsuit to pursue redress for conduct that is within the scope of the claims and allegations already asserted in the current Complaint, or attempting to obtain *res judicata* effect through this lawsuit for conduct that it has artificially blockaded from discovery. Either reason is inequitable, as requiring Plaintiff to incur the cost of filing a separate lawsuit to pursue a claim that

---

[21] See Dkt. 1, ¶¶ 17-24, 39-44. See also, e.g., Harris v. World Fin. Network Nat. Bank, 867 F. Supp. 2d 888, 895-97 (E.D. Mich. 2012) (holding that defendant's failure to cease calling plaintiff's cellular telephone number regarding other accounts after being informed by plaintiff to cease calling during collection call on one account rendered the additional calls made concerning the other accounts "willful or knowing" violations of the TCPA in the pending action).

could easily be resolved now would be a tremendous waste of the parties' and this Court's strained resources, and would benefit nobody other than the Defendant's counsel by way of additional billing opportunities.

If Keesler believes that lawfully placed the calls to his cell phone number in relation to his loan with Keesler, the appropriate procedural vehicle for asserting that position is by an affirmative defense, or by moving for a protective order, not by asserting an objection and unilaterally imposing a blockade on production of responsive materials that are clearly relevant to the claims and allegations pled in this action, and which are vital to Plaintiff's ability to prove his case.

2. Plaintiff's Request for Production of Recordings

Plaintiff's Request for Production No. 11 requests that Keesler produce "[a]udio recordings of any conversations with the Plaintiff." Keesler's Response to Request No. 11 states, in relevant part:

> *KFCU is not in possession of any recordings of the voice of Plaintiff, Steven W. Holland, related to the subject loan with Bobbie Holland and Claude Holland.*

Keesler's Response is predicated upon Keesler's erroneous position that Plaintiff's TCPA claim in this action pertains solely to calls made by Keesler related to the account of Claude and Bobbie Holland. As set forth above, Keesler's position is wholly misplaced, as Plaintiff's TCPA claim pertains to *all* calls made by Keesler to Plaintiff's cellular telephone number without his consent or after consent was revoked. These materials are essential to the Plaintiff's case, as the recordings may evidence Plaintiff's requests that Keesler cease calling, as alleged in the

15

Complaint.[22] Keesler's refusal to provide these materials is substantially prejudicial to the Plaintiff, and is yet another illustration of Keesler's obstructionist discovery tactics in this litigation.

3. <u>Documents Identifying when Keesler Acquired the Interaction Client System</u>

As set forth above, Plaintiff's ability to prevail on his TCPA claim in this action will require Plaintiff to establish that Keesler made calls to his cellular telephone number using an ATDS (within the scope defined by the FCC) or a prerecorded voice. Thus, the specific identity of the telecommunications systems utilized by Keesler to place calls to Plaintiff's cellular telephone number, and the specific time periods during which its systems were utilized, are, naturally, fundamental details that are essential to the resolution of Plaintiff's TCPA claim in this action. Keesler's Responses to several of Plaintiff's Requests for Production, however, provide only the following non-specific statement regarding the telecommunications systems used in its collections department:

> *Sometime in late 2014 or early 2015, KFCU made certain system upgrades and implemented two (2) new systems including IC Business Manager and Interaction Client, which allows for the recording of incoming and outgoing calls, and further allows for the making of various collection notes and storage of certain related information. Prior thereto, KFCU utilized the Symitar system, which allowed for notations to be made on collection matters, and various other functions for KFCU.*

Aside from this loose timeframe of "sometime in late 2014 or early 2015", Keesler's discovery responses provide absolutely no details as to when exactly it acquired and implemented the Interaction Client system. This detail is of the utmost importance, as Plaintiff's expert, Randall A. Snyder, has opined in his Declaration that the system functions as an ATDS,[23] and Defendant's 30(b)(6) witness testified that the system is used to deliver a prerecorded message at the beginning of each call made by Keesler. The determination of when this system was implemented, and when

---

[22] <u>See</u> Dkt. 1, ¶¶ 17-18.

[23] <u>See</u> Ex. "I" hereto, Declaration of Randall Snyder.

the calls were made to the Plaintiff in comparison to the implementation of this system, is central

to the Plaintiff's ability to establish the elements of his TCPA claim. Without the date the system

was implemented, and the log reflecting the date Keesler made the calls to Plaintiff's cellular

phone, it would be impossible for Plaintiff to establish the elements of his TCPA claim – facts

which are certainly not lost on Keesler and its attorneys. Keesler's 30(b)(6) witness, when asked

to clarify Keesler's vague discovery response regarding when Keesler acquired and implemented

the Interaction Client system, was unable to do so. He did, however, confirm that such details are

in Keesler's possession, and could be made available in the form of the acquisition contract.[24]

> Q.  I guess what I'm trying to determine here is we've got a range sometime in late 2014 or early 2015, I realize you say you would have to speculate as to whether somebody at Keesler knows when exactly that was done. Certainly Keesler would maintain records of when systems and software was purchased, would it not?
>
> A.   I'm confident that there's copies of the contracts, yeah.
>
> Q.  So if after we left here today, if you were to go back and talk to someone at Keesler, that's information that could be identified and provided; correct?
>
> A.  Certainly.[25]

However, when provided the opportunity to produce this information early during the discovery

period in response to Plaintiff's request for production of these very materials, Keesler interposed

a frivolous objection in an obvious effort to avoid providing this essential information. By way of

example, Request No. 21 of Plaintiff's First Requests for Production requests the following:

> *Copies of any and all acquisition agreements for the telephone dialing system used by Defendant to place calls to Plaintiff's cellular telephone number, (228) 343-1833, during the "relevant time period."*

In Response to Request 21, Keesler asserted the following objection:

---

[24] See Ex. "F" hereto, Depo. D. Powell, p. 63:3 to 65:19.

[25] Id., at p. 65:5 to 65:19

*Defendant objects to request in that the same (including prior subparts) exceeds the 25 requests allowed by Federal Rule 33(a)(l) and the existing case management order. Defendant further objects to the request as the same is not relevant to the subject claims, and is not reasonably intended to lead to the discovery of admissible or relevant evidence.*

At the outset, Keesler's reliance on Fed. R. Civ. P. 33(a)(1) is wholly without merit.[26] Rule 33 pertains to Interrogatories to Parties, not Requests for Production. Requests for Production are governed by Rule 34, which includes no analogous provision to Rule 33(a)(1). Moreover, although the Case Management Order in this case (Dkt. 9) limits the number of Requests for Production each party may propound to 25 "succinct questions," there is no "subparts" provision to the limitation as Keesler asserted. More importantly, even if there were a "subpart" distinction in the Case Management Order, there is not a single subpart included in Request 1 - 20. Each of Requests 1 - 20 consists of single *succinct* sentence requesting a specific category of documents, limited in scope by the clearly articulated set of definitions preceding the Requests. These deficiencies were brought to the attention of Keesler's counsel in the July 10, 2016 letter, but Keesler refused to with draw its objection, refused to provide any responsive materials, and failed to prepare its 30(b)(6) witness to provide these details. This illustrates the very type of obstructionist discovery abuse that has been the subject of the admonishments by federal courts referenced in the introduction of this Motion, and should be sanctioned by this Court to curtail its continued application in the future of this action and others. Plaintiff would further request that the Defendant be compelled to produce the documents responsive to Request 21, as described by Keesler's 30(b)(6) witness above.

## III.   **Keesler's False, Misleading and/or Frivolous Discovery Responses and Objections**

Fed. R. Civ. P. 26(g) provides as follows, in relevant part:

(g) Signing Disclosures and Discovery Requests, Responses, and Objections.

---

[26] Notably, Keesler asserted this identical frivolous objection to Requests 21 through 24 of Plaintiff's First Request for Production.

18

(1) *Signature Required; Effect of Signature.* Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented--and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

…

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

(3) *Sanction for Improper Certification.* If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g). Keesler's responses to Plaintiff's discovery requests contain numerous false or misleading statements of fact, in addition numerous frivolous boilerplate or improvident objections that were interposed for no reason other than to obstruct the free flow of clearly discoverable information in Defendant's sole control, and to cause the Plaintiff to suffer additional delay and expense to obtain the information necessary to prove his TCPA claim.[27]

---

[27] See, e.g., Plaintiff's July 10, 2016 letter, which outlines the extent of Keesler's improvident objections and deficient responses in thorough detail, with supporting legal authority. Notably, the letter addresses Keesler's Answers to Plaintiff's First Set of Interrogatories No. 3, 5, 6, 7, 8, 9, 10 and 11, and Plaintiff's Set of Set of Interrogatories No. 1, Responses to Plaintiff's Requests for Admission No. 1, 6, 7, 14, and Responses to Plaintiff's Requests for Production No. 3, 5, 6, 7, 15 each assert various objections, followed by the statement "[w]ithout waiving the same," and then proceed to provide a purported answer to the discovery request. It is well established that "such objections and answer 'preserve[] nothing and serve[] only to waste the time and resources of both the Parties and the Court. Further, such practice leaves the requesting Party uncertain as to whether the question has actually been fully answered or whether only a portion of the question has been answered." Thermoset Corp. v. Bldg. Materials Corp. of Am., 14-60268-CIV, 2014 WL 6473232, at *3-4 (S.D. Fla. 2014).[27] See also Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, Nos. 11–2684–JWL, 11–2685–JWL, and 11–2686–JWL, 2014 WL 545544, at *2 (D.Kan. Feb.11, 2014) (stating that

Notably, Interrogatory No. 6 of Plaintiff's First Set of Interrogatories states:

*If Defendant contends that the calls it placed to Plaintiff s cellular telephone number, (228) 343-1833, were manually dialed, please state all facts which support this contention, including by describing in detail the process utilized by Defendant's representatives for manually dialing phone calls, and identifying the specific equipment utilized by Defendant for manually dialing phone calls.*

Keesler's Answer to Interrogatory No. 6 states

*Defendant objects that this Interrogatory contains multiple sub-parts in violation of the Rules of Federal Procedure. Without waiving same, Defendant would further state that Defendant's employees utilized only lawful means of communication, which included using manually dialed telephones provided by KFCU to contact customers. To manually dial numbers employees of the Defendant use their fingers and touch keys on the phone they are using. Defendant reserves the right to supplement this response as more information becomes available.*

To begin with, Keesler's objection is factually and legally meritless, as "sub-parts" do not violate the Federal Rules of Civil Procedure,[28] but in any case, Interrogatory No. 6 is a contention interrogatory, and clearly does not contain any "discreet subparts" as described under Rule 33.[29] Furthermore, with respect to the factual statements provided in the Answer, Keesler's designated 30(b)(6) witness, Delma Powell, testified during his August 30, 2016 deposition that the facts described in Keesler's Answer to Interrogatory No. 6 are inaccurate, and that Keesler representatives do not, in fact, use their fingers to touch keys on desk-set phones to make collection

---

practice of objecting to discovery requests and then answering "subject to or without waiving" objections "is manifestly confusing (at best) and misleading (at worst), and has no basis at all in the Federal Rules of Civil Procedure"; joining "a growing number of federal district courts in concluding that such conditional answers are invalid and unsustainable"); Dollar v. Long Mfg., N.C., Inc., 561 F.2d 613, 616-17 (5th Cir. 1977) ("Discovery by interrogatory requires candor in responding. … A partial answer by a party reserving an undisclosed objection to answering fully is not candid. It is evasive. … A unilateral declaration that no objections are waived will not be allowed to displace the command of Rule 33 that the party either answer fully or object").

[28] Rule 33(a)(1) provides that a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts.

[29] See Advisory Committee Notes, explaining that "Parties cannot evade this presumptive [25 interrogatories] limitation through the device of joining as 'subparts' questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

calls. As explained by Mr. Powell:

> A.   [T]hey're using a mouse to interact with a key pad on the computer screen, meaning just as you would on the key pad of the phone, push the one and the two, they're using the mouse to click that on the face of the software.
>
> Q.   I'm familiar with what you're talking about, that's why I wanted to get some clarity on that.  So that's a pathway with the Interaction Client software?
>
> A.   That's correct.
>
> Q.   So those calls would be made from the workstation of the collection representative that's initiating the call through the mouse function on their computer?
>
> A.   That describes it, yes.[30]

These differences are extremely significant in the context of the TCPA claim at issue in this action.[31] A TCPA claim has two elements: (1) a call to a cellular telephone; (2) using an "automatic telephone dialing system" ("ATDS") or an "artificial or prerecorded voice."[32] Establishing the use of an ATDS turns on a highly technical analysis of a defendant's telecommunications systems (including software and equipment) and the FCC orders defining the scope of such technology under the TCPA.[33] To that end, the Declaration of Plaintiff's expert, Randall A. Snyder, which was prepared after having reviewed Keesler's discovery responses and Mr. Powell's deposition testimony, illustrates the significance of Mr. Powell's testimony concerning the actual process used by Keesler's representatives in the technical analysis of the ATDS issue, as opposed to the inaccurate facts set forth in Keesler's Interrogatory answer. By way

---

[30] See Ex. "F" hereto, Depo. D. Powell, p. 76:23 to 77:20.

[31] Involving calls made to a cellular telephone, pursuant to 47 U.S.C. § 227(b)(1)(A)(iii).

[32] Murphy v. DCI Biologicals Orlando, LLC, 59 Communications Reg. (P&F) 905, 2013 WL 6865772, *4 (M.D. Fla. 2013), aff'd, 797 F.3d 1302 (11th Cir. 2015).

[33] Congress delegated authority to the FCC to implement the TCPA. See 47 U.S.C. § 227(b)(2). "District courts may not determine the validity of FCC orders, including by refusing to enforce an FCC interpretation, because '[d]eeming agency action invalid or ineffective is precisely the sort of review the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders.'" Murphy v. DCI Biologicals Orlando, LLC, 797 F.3d 1302, 1306-07 (11th Cir. 2015) (citations omitted).

of example, Mr. Snyder explained, in relevant part:

> *According to Mr. Delma Powell, vice president of consumer lending, collection representatives (i.e., call center agents) use the Interaction Desktop Client application from their computer screens to initiate calls to cellular telephones of consumers. (Exhibit L, Powell Dep., 76:23-77:20.)*
>
> …
>
> *Collection representatives, in fact, when initiating an outbound call to cellular telephones, actually only initiate a software process. This software process causes the telephone number digits to be sent into the dialing system. The dialing system then takes those digits and performs what might be considered a version of predictive dialing. The dialing system actually takes the telephone digits, automatically dials those digits and analyzes (i.e., listens to) the call progress tones.*[34]

As such, Keesler's Answer to Interrogatory No. 6, which asserts a meritless objection,

followed by a wholly inaccurate statement, violates the certification requirement under Rule 26(g).

Keesler's Responses to Plaintiff's Request for Admissions also contain factually inaccurate

statements central to Plaintiff's TCPA claim, the falsity of which were likewise exposed during

Mr. Powell's deposition. Specifically, Plaintiff's Request for Admission No. 14 states:

> *Admit that none of the telephone calls made by Defendant to Plaintiff's cellular telephone number, (228) 343-1833, during the relevant period were made for emergency purposes.*

Keesler's Response to this request states:

> *Defendant objects to Request No. 14, in that the same calls for a legal conclusion, is vague and ambiguous as to the term "emergency purposes". Without waiving the same KFCU denies this request as stated. Additionally, insofar as the Request implies that Defendant made any violation of the Telephone Consumer Protection Act, the same is denied. Any implication of impropriety by KFCU is strictly denied.*

When Mr. Powell was asked to identify the factual basis supporting Keesler's denial of

Request No. 14, he testified that none of the calls placed by Keesler to Plaintiff's cellular telephone

number were in fact made for emergency purposes.

Q.  […] My question for you is, as Keesler's designated 30(b)(6) representative, I want

---

[34] See Ex. "I" hereto, Declaration of Randall Snyder, ¶¶ 32, 36.

22

the factual basis for Keesler's denial of that request for admissions; in other words, what is Keesler's factual basis for asserting that any of the calls it made to my client's cellular telephone number were made for emergency purposes?

A.  […]  I'm not aware that any were made for emergency purposes.[35]

Q.  So for the record, just to get a clear answer to the emergency purposes question, is there any factual basis to support that any of the calls made to my client's cellular telephone number were made by Keesler for emergency purposes?

A.  I am not aware of any of the calls that were made by Keesler to be for emergency purposes.[36]

…

A.  I am not suggesting that there is a possibility that any of those calls were made for emergency purposes.[37]

As Mr. Powell's testimony clearly demonstrates, Keesler's denial of Request No. 14 had no basis in fact, and was clearly interposed to frustrate the discovery process, and to impede Plaintiff from utilizing the less costly and less burdensome discovery mechanism of admission under Rule 36 to establish facts relevant to his TCPA claim,[38] requiring Plaintiff to undertake the additional effort and expense of establishing these facts and seeking clarification concerning the initial written denials through the costly deposition process. Because the information available to Keesler required that it admit Request No. 14, Keesler's frivolous denial was clearly interposed to cause unnecessary delay and needlessly increase the cost of litigation, and therefore violates the Rule 26(g) certification requirement.  The aforementioned examples, in addition to the numerous examples outlined in Plaintiff's July 10, 2016 letter, which Plaintiff incorporates by reference for

---

[35] See Ex. "F" hereto, Depo. D. Powell, p. 89:12 to 89:22.

[36] Id., p. 90:2 to 90:8.

[37] Id., p. 90:18 to 90:20.

[38] The issue of whether the calls were made by Defendant for emergency purposes is central to the Plaintiff's TCPA claim, as the TCPA's statutory prohibition against making any call using an ATDS or prerecorded message to a cellular telephone number is subject to two (2) exemptions: (1) calls made for "emergency purposes," and (2) calls made with the "prior express consent" of the called party. See 47 U.S.C. § 227(b)(1)(A); Nigro v. Mercantile Adjustment Bureau, LLC, 769 F.3d 804, 805-06 (2d Cir. 2014) ("There are two exceptions to this categorical bar. The statute permits calls (i) 'made for emergency purposes' or (ii) 'made with the prior express consent of the called party.'")

the purpose of demonstrating the pattern by Keesler and its counsel of violating their duty to certify that Keesler's responses and objections to Plaintiff's discovery requests in in this action, "to the best of [the signer's] knowledge, information, and belief formed after a reasonable inquiry" are (1) consistent with the Federal Rules of Civil Procedure and warranted by existing law, and (2) not interposed for an improper purpose such as to cause unnecessary delay or needlessly increase the cost of litigation. As is apparent, had Keesler's attorneys and its representative that verified its answers to Plaintiff's First Set of Interrogatories performed a "reasonable inquiry" with respect to the issues outlined herein, it would have been clear to those individuals that the improvident objections and the false, misleading and incomplete responses would not have been asserted.

## III.   **Appropriateness of Sanctions**

"Rule 37(5) provides guidance for dealing with payment of expenses when a motion to compel is filed." Liberty Mut. Ins. Co. v. Tedford, Case No. 3:07-cv-73-A-A, 2008 WL 2080930, at *8 (N.D. Miss. 2008). The Rule currently provides as follows, in relevant part:

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

    (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

    (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

    (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(5).

"Both parties and counsel may be held personally liable for expenses, "including attorney's fees," caused by the failure to comply with discovery orders. <u>Roadway Exp., Inc. v. Piper</u>, 447 U.S. 752, 763–64 (1980) (citations omitted). Rule 37 sanctions must be applied diligently *764 both "to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>Id.</u> (citations omitted). "Rule 37 sanctions are 'entrusted to the discretion of the trial judge' and should be imposed to adequately protect the discovery process.'" <u>Provenza v. Witt-Stamps</u>, 1:09CV191-LG-RHW, 2011 WL 2680690, at *3 (S.D. Miss. 2011) (quoting <u>Diaz v. S. Drilling Corp.</u>, 427 F.2d 1118, 1126 (5th Cir. 1970)). "Lesser sanctions do not require a finding of willfulness." <u>Payne v. Univ. of S. Mississippi</u>, 2013 WL 2149724, at *2–3 (S.D. Miss. 2013) (citations omitted). Additionally, "[t]he court has inherent power to levy sanctions in response to abusive litigation practices during discovery." <u>Thomas v. Hoffmann-LaRoche, Inc.</u>, 126 F.R.D. 522, 525 (N.D. Miss. 1989).

"The Court's primary concern is equity, and it simply would not be equitable to force Plaintiff to shoulder the burden for expenses that would not have been incurred but for Defendant's failure to fulfill its discovery obligations." <u>PIC Group, Inc. v. LandCoast Insulation, Inc.</u>, 1:09-CV-662-KS-MTP, 2011 WL 2669144, at *9–11 (S.D. Miss. 2011) (citing <u>B.F. Goodrich Tire Co. v. Lyster</u>, 328 F.2d 411, 416 (5th Cir.1964) (in conducting Rule 37 analysis, court held that its final responsibility was to see justice done between parties).

As set forth above, Plaintiff made every conceivable effort to obtain the materials at issue from the Defendant and its counsel prior to seeking intervention by this Court. Neither Defendant's basis for refusing to produce the requested materials, nor its frivolous, boilerplate written objections to Plaintiff's discovery requests, were substantially justified. Accordingly, Rule 37(5)

25

mandates that Defendant and/or its counsel be required to pay Plaintiff's reasonable expenses incurred in bringing this motion, including attorney's fees.

Furthermore, as set forth above, pursuant to Rule 26(g)(3), where "a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction [including an order to pay attorney's fees caused by the violation] on the signer, the party on whose behalf the signer was acting, or both." The frivolous, improvident objections interposed by Defendant and its counsel in its Responses to Plaintiff's First and Second set of Discovery Requests, as described above, and as outlined in thorough detail with supporting authority in Plaintiff's July 10, 2016 letter to counsel for Keesler,[39] as well as Defendant's false, misleading and incomplete discovery responses, all of which were done for the conscious and deliberate purpose of obstructing Plaintiff from obtaining materials and information essential to his claims during the discovery period, and causing unnecessary delay and expense, warrant the imposition of sanctions under Rule 26(g)(3). See Malautea, supra, 987 F.2d at 1545 (holding that "Rule 26(g) required the [district court] judge to sanction the defendants, the attorneys who signed their discovery responses and objections, or both" based on the court's finding that "the defendants' discovery responses and objections were interposed for the improper purposes of 'caus[ing] unnecessary delay, [increasing] the cost of litigation for the Plaintiff, and [causing] the time for discovery to end before the Plaintiff had obtained the discovery material that she needed to litigate this case'", and concluding that "[i]mposing costs and attorneys' fees against both the defendants and their attorneys was not an abuse of discretion; indeed, that sanction is suggested in the text of the rule.").

---

[39] See Ex. "E" hereto.

WHEREFORE, Plaintiff, STEVEN W. HOLLAND, respectfully requests that this Court enter an Order compelling Defendant to produce the requested materials and imposing sanctions on the Defendant and its counsel as this Court deems appropriate, including payment of Plaintiff's attorneys fees incurred in bringing this motion, and for such other relief as this Court deems just and proper.[40]

Respectfully submitted this 13th day of September, 2016,

*/s/David P. Mitchell*
David P. Mitchell, Esq.
Admitted *pro hac vice*
Florida Bar No. 067249
MANEY & GORDON, P.A.
101 East Kennedy Blvd., Suite 3170
Tampa, Florida 33602
Telephone: (813) 221-1366
Fax: (813) 223-5920
d.mitchell@maneygordon.com
v.marrero@maneygordon.com
Counsel for Defendant/Counterclaimant

*and*

Walter J. Blessey, IV, Esquire
MSB No.: 3592
WALTER J. BLESSEY, IV
1012 Beach Blvd.
P.O. Box 183
Biloxi, MS 39533-0183
Tel: (228) 374-7022
blesseyiv@yahoo.com
Counsel for Defendant/Counterclaimant

---

[40] Plaintiff would note that although he has not filed a Form #4 Certificate with this Motion, "the Magistrate Judge has the authority and the jurisdiction to consider the motion without the Good Faith Certificate." Vineyard Dev. Co. v. Rogers, CIV. A. 3:96CV804, 1997 WL 450052, at *1–2 (S.D. Miss. 1997). "The Uniform Local Rules are not jurisdictional in nature, and the Court is free to rule on motions not served in precise compliance with them." Id. "[T] the obvious purposes of Rule 6(c) of the Uniform Local Rules are to encourage parties to confer between or among themselves and to avoid using the limited time and resources of the Court on routine discovery disputes." Id. The Defendant's refusal to comply with Plaintff's July 10, 2016 letter, and the discussion on the record in the attached transcript (Ex. G), demonstrates that Defendant and its counsel "have neither the intention to cooperate with [Plaintiff] regarding [the discovery dispute] nor the desire to conserve the resources the Court." Id.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of September, 2016, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send a notice of electronic filings via the Court's ECF system to all CM/ECF participants.

*/s/David P. Mitchell*
David P. Mitchell, Esq.